OPINION
{¶ 1} The State of Ohio appeals the Portage County Court of Common Pleas' judgment granting Randy Resh's ("Resh") petition for post — conviction relief and vacating Resh's convictions for murder and attempted rape. We reverse.
 {¶ 2} On August 14, 1988, Connie Nardi ("Nardi") was beaten and strangled to death. Nardi's body was ultimately deposited in the Hiram Rapids Pond where it was discovered the following day. Troy Busta ("Busta"), Robert Gondor ("Gondor"), and Resh were charged with the murder, rape, and kidnapping of Nardi. In 1989, Busta pleaded guilty to Nardi's murder and subsequently testified against Resh and Gondor in their separate trials in 1990. The facts adduced at trial are as follows:
 {¶ 3} On August 15, 1988, at approximately 6:45 p.m., the body of Connie Nardi was found floating, face down, in a pond located near Rapids Road in Geauga County. An autopsy revealed Nardi had been strangled. Geauga County authorities conducted the initial investigation of Nardi's death. After discovering a missing person report had been filed with the Portage County Sheriff, the Geauga County investigators determined the body found was that of Nardi. The Geauga investigators learned Nardi owned a red Toyota truck. The truck was not found near the pond and the authorities reported it stolen. The truck was found at Ed's Upper Deck, a bar in Mantua, Portage County. Discussions with Edward Douglas ("Douglas"), the owner of the Upper Deck, disclosed Nardi had left the bar twice with Busta on the night of her death. She did not return to the bar after she left with Busta the second time.
 {¶ 4} Busta was arrested for Nardi's murder and confessed to the crime. He also implicated Resh and Gondor. At Resh's trial, Busta testified he and Nardi were at the Upper Deck when Resh and Gondor arrived. Busta took Nardi for a motorcycle ride to the washed out bridge area on Allyn Road in the Hiram Rapids area to cool off. The two returned to the bar and Busta falsely told Resh he had had sex with Nardi. Busta testified he and Resh concocted a plan whereby Nardi might be induced into having sex with Resh.
 {¶ 5} Busta stated he bought a "split-six" of beer: Three Coronas and three Pabsts. He and Nardi then returned to the river on the motorcycle. Busta indicated that when Resh and Gondor arrived, Resh solicited sex from Nardi; she refused. Resh jumped on her and held her down. Busta and Gondor held Nardi's hands and feet while her shorts and underwear were removed. Busta testified Resh struck Nardi on the sides of her face then strangled her to death.
 {¶ 6} Busta stated he, Resh, and Gondor placed Nardi's body in the back of Gondor's white pick-up truck. Resh and Gondor then drove to the parking lot near the Rapids Road pond and Busta followed on the motorcycle. The three dumped Nardi's body in the pond. Busta then left Resh and Gondor, hid Nardi's purse, and discarded the remnants of the "split-six" pack of beer on the opposite side of the bridge in weeds near the intersection of Abbott and Allyn Roads. Busta returned to the Upper Deck where he again met Resh and Gondor. Busta testified that wood in the bed of Gondor's truck had blood on it and, as a result, the three men began tossing it from the truck toward a bar across the street. Resh admitted throwing the wood from the truck but failed to explain why the three did so.
 {¶ 7} After the Upper Deck closed, Resh and Gondor followed Busta to his residence in the white pick-up truck. Ultimately, Resh and Gondor left and, at 12:42 a.m., ordered a pizza from Domino's Pizza in Streetsboro. Resh testified he and Gondor picked up the pizza, went home, ate it, and fell asleep. At trial, testimony established that on Monday, August 15, 1988, the day Nardi's body was discovered, the owner of Domino's received a call from a person who stuttered (it was established earlier at trial that Gondor stuttered). Because of the phone call, the owner placed Gondor's name on the receipt for the pizza that had been ordered the night before.
 {¶ 8} The authorities located the white pick-up Gondor was driving on the night of the murder. An analysis of the black plastic bed liner revealed the existence of what was alleged to be human blood near the tailgate of the truck on the passenger side.
 {¶ 9} At Resh's trial, the state relied upon three principle categories of evidence: Busta's testimony, "false alibi" evidence, and "invisible" blood evidence. Specifically, Busta testified he, Resh, and Gondor killed Nardi on the night of August 14-15, 1988 and disposed of her body. The state also presented evidence that Resh and Gondor attempted to create an alibi for their whereabouts the night of Nardi's murder before they were suspects. The state argued this demonstrated "guilty knowledge," i.e., only knowledge the perpetrators would possess. Finally, the state presented "invisible" blood evidence that Bureau of Criminal Investigation (B.C.I.) Criminalist Dale Laux ("Laux") testified was found in the bed liner of Gondor's pick-up truck.
 {¶ 10} A jury convicted Resh of murder and attempted rape. Resh was sentenced to five to fifteen years for attempted rape and fifteen years to life for murder, to be served consecutively. We affirmed the convictions. See, State v. Resh (Dec. 11, 1992), 11th Dist. No. 90-P-2256, 1992 Ohio App. LEXIS 6222 ("Resh I"). The Supreme Court of Ohio declined jurisdiction to review Resh's discretionary appeal. (1993)66 Ohio St.3d 1473.
 {¶ 11} On September 20, 1996, Resh filed a petition for post-conviction relief without attaching any evidentiary materials. The trial court denied the petition without filing findings of fact and conclusions of law. Resh moved to reconsider and filed an amended petition with attached evidentiary materials. The amended petition was denied and Resh appealed. After remanding the case for the trial court's findings of facts and conclusions of law, we considered the appeal. See,State v. Resh (1997), 124 Ohio App.3d 694. Subsequently, we remanded the case holding the trial court erred in denying the petition without first conducting an evidentiary hearing.
 {¶ 12} The matter proceeded to a post-conviction hearing. In support of their petitions, Resh and Gondor claimed the state failed to turn over relevant and exculpatory evidence as required by Brady v. Maryland
(1963), 373 U.S. 83 and that they were denied the effective assistance of counsel.
 {¶ 13} Busta sought to intervene in the post-conviction proceedings. Busta's motion to intervene was premised upon his interest in protecting certain privileged attorney-client material that could be disclosed in the course of Resh's case.[1] See, State v. Resh (June 29, 2001), 11th Dist. No. 99-P-0035, 2001 Ohio App. LEXIS 2956. The trial court denied Busta's motion, but stayed the post-conviction hearing pending Busta's appeal to this court. We reversed the trial court's decision denying Busta's motion to intervene and remanded the matter to the trial court.
 {¶ 14} During the post-conviction hearing, Resh's trial counsel, James Draper ("Draper"), testified he began representing Resh in April 1990. Draper testified he was in the process of trying a case in federal court at the time he represented Resh. Draper moved for continuances in the federal case and Resh's case; both motions were denied.
 {¶ 15} Draper stated he understood discovery in the Resh case would be conducted through an open-file procedure. Draper admitted he reviewed the prosecutor's file; however, he noted he only inspected a portion because the files were "voluminous." Draper testified he did not go through the entire file due to his trial schedule and because he relied on the material provided by the prosecutor. Draper admitted he could not recall what he had received from the prosecution in discovery because he did not copy the whole file.
 {¶ 16} At the time of the crime, Ron Craig ("Craig") was the investigator for the Portage County Prosecutor's Office. Craig testified he was responsible for gathering the evidence on the Nardi homicide, which he arranged in a master file. This file was made available to Draper. Craig testified Draper looked through the evidence at the prosecutor's office for "a few days."
 {¶ 17} After the eight day joint post-conviction hearing, the trial court denied Resh's Brady claim, finding the prosecution did not withhold material exculpatory evidence. However, the trial court found Resh received ineffective assistance of counsel because Draper failed to properly investigate the prosecutor's file and present evidence contained therein. Thus, the trial court vacated Resh's convictions and ordered a new trial.
 {¶ 18} On July 1, 2002, the state filed a timely notice of appeal raising the following assignments of error:
 {¶ 19} "[1.] The trial court's findings of fact and conclusions of law are clearly erroneous and therefore inadequate to meet the mandate of R.C. 2953.21 or to permit this Court to review the trial court's decision.
 {¶ 20} "[2.] The trial court erred in: 1) failing to consider the Appellant's argument under the doctrine of Res Judicata and 2) reaching the merits of Petitioner's ineffective assistance of counsel claim regarding issues that were contained in the trial record, as the Petitioner's claim was barred by the doctrine of Res Judicata.
 {¶ 21} "[3.] The trial court's decision overruling the Appellant's Civ. R. 41 motion to dismiss was in error as the Petitioner failed to establish a denial of the effective assistance of trial counsel in violation of the Petitioner's Sixth Amendment [sic] to the United States Constitution and Article I, Section 16 of the Ohio Constitution.
 {¶ 22} "[4.] The trial court's decision granting the Petitioner postconviction relief on his ineffective assistance of counsel claim was contrary to the manifest weight of the evidence."
 {¶ 23} It is important to note the standard of review we apply in determining this appeal, i.e., we review the trial court's judgment granting Resh's petition for post conviction relief de novo. State v.Braden, 10th Dist. No. 02AP-954, 2003-Ohio-2949, ¶ 13.
 {¶ 24} We address appellant's second assignment of error first. In its second assignment of error, the state maintains the doctrine of res judicata precluded the trial court from reaching Resh's claim of ineffective assistance of counsel. The state argues the evidence on which Resh relied in support of his post-conviction petition was part of the prosecutor's files and thus was not dehors the record. In the alternative, the state contends that even if the prosecutor's files are not part of the record, the evidence in question was affirmatively present within Resh's trial transcript and, consequently part of the record.
 {¶ 25} When a defendant is represented by different counsel on appeal, a final judgment of conviction bars a petitioner from raising and litigating, in any proceeding except direct appeal from the judgment, any defense, or claimed lack of due process that was raised or could have been raised by the defendant at trial or on direct appeal from the judgment. State v. Perry (1967), 10 Ohio St.2d 175, paragraph nine of the syllabus. If the claim can be proved by the record of the trial proceedings, the claim must be raised on direct appeal or it is waived and may not be considered in a petition for post-conviction relief. State v.Knepper (May 19, 1989), 11th Dist. No. 3950, 1989 WL 506392, citing Statev. Gibson (1980), 69 Ohio App.2d 91, 99. If a defendant raises an ineffective assistance claim during his direct appeal and the appellate court holds the claim is without merit upon the record before the appellate court, res judicata bars a relitigation of the issue in a post-conviction relief proceeding. Id.
 {¶ 26} However, a court can reach the merits of an ineffective assistance claim in post-conviction proceedings if the claim was not apparent at the time of the trial or appeal. State v. Cole (1982),2 Ohio St.3d 112, syllabus; see also, Knepper, supra, at 3. Thus, to survive the doctrine of res judicata, a petitioner must demonstrate that his ineffective assistance claim could not have been fairly determined without resorting to evidence dehors the record. Cole, supra. The state contends every evidentiary item relied upon by Resh was contained in the prosecutor's master files and available for open-file discovery. Accordingly, the state concludes the material was not evidence dehors the record. We disagree.
 {¶ 27} In State v. Hooks, 92 Ohio St.3d 83, 2001-Ohio-150, the Supreme Court of Ohio stated:
 {¶ 28} "* * * a reviewing court cannot add matter to the record before it that was not a part of the trial court's proceedings, and then decide the appeal on the basis of the new matter. Nor can the effectiveness of appellate counsel be judged by adding new matter to the record and then arguing that counsel should have raised these new issues revealed by this newly added material." (Citation omitted.) Id. at 84.
 {¶ 29} The record on appeal consists of those items introduced into evidence in the lower court, as well as a compilation of pleadings, motions, briefs and other papers filed in the proceeding in the lower court. The record does not include the prosecution's files. Consequently, the evidence on which Resh relies to support his ineffective assistance claim was not part of the record and could not have been raised on direct appeal. Because the only way Resh could prove his ineffective assistance claim was by recourse to evidence dehors the record, his claim falls squarely under the exception carved out by the Supreme Court of Ohio in Cole.
 {¶ 30} The state nevertheless contends the exculpatory evidence on which the trial court relied in vacating Resh's convictions was affirmatively apparent within the record at the time of Resh's direct appeal. Therefore, the state contends Resh's ineffective assistance claim is barred by res judicata. We disagree.
 {¶ 31} In Resh I, Resh attempted to raise an ineffective assistance claim based upon his counsel's failure to use certain evidence dehors the record. We rejected Resh's claim, holding that "* * * nothing [in this opinion] should be construed to prevent appellant from asserting and supporting a claim of ineffective assistance of counsel * * * in a post conviction relief proceeding." Id. at 17. Thus, pursuant to Resh I, Resh is entitled to raise the evidence in question to support his petition for post-conviction relief so long as it was outside the record of his trial.
 {¶ 32} An ineffective assistance of counsel claim exists to vindicate the denial of one's constitutional rights. Thus, we must tread carefully when analyzing such a claim and beware of oversimplifying the evidentiary details on which a petitioner relies. Here, although certain names and details appear in the trial transcript, there is no direct discussion of the salient details on which Resh bases his ineffective assistance claim. Put differently, the record does not reveal that the evidence relied upon by Resh was within the record; it is derivative of witness reports, statements, and other documentary evidence not explored at trial and therefore was neither apparent nor tacit in the record.
 {¶ 33} The doctrine of res judicata did not preclude Resh from raising an ineffective assistance of counsel claim. Appellant's second assignment of error is without merit.
 {¶ 34} In its first assignment of error, the state challenges the validity of the trial court's findings of fact and conclusions of law on six grounds: (1) The trial court's finding of the date of the Nardi homicide is clearly erroneous; (2) the trial court's findings of fact regarding the trial testimony of Resh and Busta is clearly erroneous; (3) the trial court's inherently inconsistent findings and conclusions regarding Resh's separate claims for relief are clearly erroneous; (4) the trial court's finding that a climatological report was exculpatory and its finding that the report demonstrated Brenda Holcomb's ("Holcomb") trial testimony was wrong is clearly erroneous; (5) the trial court's summary of the 1990 Serological Institute report is clearly erroneous; and (6) the trial court's finding that specific evidence presented at the hearing and referred to in the trial court's entry was in existence at the time of Resh's trial is clearly erroneous.
 {¶ 35} "The existence of findings and conclusions are essential in order to prosecute an appeal. Without them, a [party] knows no more than he lost and hence is effectively precluded from making a reasoned appeal. In addition, the failure of a trial judge to make the requisite findings prevents any meaningful judicial review, for it is the findings and the conclusions which an appellate court reviews for error." Statev. Mapson (1982), 1 Ohio St.3d 217, 219.
 {¶ 36} The test for adequacy of findings and conclusions is "* * * whether they are sufficiently comprehensive and pertinent to the issue to form a basis for the decision and whether they are supported by the evidence." State v. Clemmons (1989), 58 Ohio App.3d 45, 46, quoting S A Moore, Federal Practice (2 Ed. 1990) 52-142, section 52.06(1). "In order for an appellate court to determine the basis for judgment, the findings and conclusions should respond to all material or determinative issues in the case." State v. Lindsey, 12th Dist. No. 2002-02-002, 2003-Ohio-811, at 8.
 {¶ 37} The state first argues that a typographical error at the beginning of the trial court's June 14, 2002 findings renders the findings and conclusions clearly erroneous. Specifically, the trial court listed the date of the homicide as August 14, 1998 rather than August 14, 1988. The date is quoted correctly throughout the remainder of the court's findings and conclusions. The state fails to explain how this typographical error affected the trial court's analysis and we find this error harmless.
 {¶ 38} The state next claims the trial court's findings and conclusions erroneously summarized certain testimony from the original trials of Resh and Gondor. Specifically, the state maintains the trial court's findings of fact include a "large discrepancy" regarding when Busta left the bar to purchase the "split-six" of beer. The court's June 14, 2002 entry indicates Busta left the bar at "about 8:30." However, the state notes that at Gondor's trial, Busta left the bar around 9:00 or 9:30. Notwithstanding this "inconsistency," Busta testified at Resh's trial that he left at 8:30 p.m. and we noted the same in State v. Resh
(1997), 124 Ohio App.3d 694. Although there is some difference between the testimony offered at Gondor's trial and that offered at Resh's, the difference is inconsequential as both are supported by the evidence. In any event, the alleged misstatement neither affects nor undermines the court's conclusions regarding Resh's ineffective assistance claim.
 {¶ 39} The state also contends the trial court failed to mention that Busta returned to the bar alone. The court's findings and conclusions state: "Busta then returned to the Upper Deck bar. Resh and Gondor had also returned and were drinking more beer." The court's findings imply Busta did, in fact, return to the Upper Deck alone.
 {¶ 40} The state further notes that the record of both trials reflects that Busta testified Gondor removed Nardi's shorts while Resh sat on her stomach. In its entry, however, the trial court states that "Resh * * * sat on Connie Nardi's stomach and stripped off her shorts and underwear." However, Resh notes that were the word "Gondor" inserted between "and" and "stripped," the statement would be thoroughly accurate. Despite this minor mischaracterization of the facts, the court's finding does not impair the comprehensiveness of the findings such that they fail to form a basis for the decision. Thus, this omission is harmless.
 {¶ 41} The state next contends the court's findings and conclusions fail to note a "major contradiction" in Resh and Gondor's testimony regarding whether Gondor and Resh followed Busta home on the night in question. Gondor testified at his trial that they did not. Resh was unsure. Such testimony is not necessarily contradictory. Even were we to find such a contradiction, the contradiction is not material to the issue of whether Resh received ineffective assistance of counsel. As such, we hold the trial court's summary of the trial testimony was sufficiently comprehensive and pertinent to the issue to form a basis for the decision and was supported by the evidence. Clemmons, supra, at 46.
 {¶ 42} Next, the state argues the trial court's decision regarding Resh's two claims for relief, viz., the Brady violation and ineffective assistance of counsel claim, are inherently inconsistent. Specifically, the state alleges that, in denying Resh's Brady claim, the trial court necessarily disregarded Draper's testimony. As such, the trial court's reliance on Draper's testimony in concluding Resh received ineffective assistance is inherently inconsistent. We disagree.
 {¶ 43} Under Brady, the petitioner must present evidence to prove the state failed to disclose material, exculpatory evidence. See, e.g., Moorev. Illinois (1972), 408 U.S. 786, 795. Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. United States v. Bagley (1985), 473 U.S. 667,682. The standard of materiality for a Brady violation is the same as that of prejudice for an ineffective assistance claim.
 {¶ 44} Here, the trial court found no Brady violation because the prosecutor's files contained the evidence on which Resh relied in support of his post-conviction petition and Portage County utilized an open-file discovery procedure. The trial court also found:
 {¶ 45} "As to the second ground alleged, i.e.[,] that the Petitioners were denied effective assistance of counsel, the Court finds that the evidence itemized herein dehors the record, that such evidence is material as defined in * * * Bagley * * *; that for failing to use such evidence in the trial, counsel for each of the Petitioners was ineffective, that had such evidence been disclosed to the juries that decided these cases, there is a reasonable probability that the result of the proceedings would have been different. Certainly the juries should have been given this evidence for their consideration for their verdicts to be worthy of confidence. Without the benefit of such evidence this Court finds the verdicts rendered are not worthy of confidence."
 {¶ 46} When asserting an ineffective assistance claim, a party must show deficient performance and subsequent prejudice. Strickland v.Washington (1984), 466 U.S. 668. Here, the trial court found Draper's performance was deficient because he failed to use the evidence available to him at the 1990 trials. The trial court also found there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different, i.e., the verdict was not worthy of confidence.
 {¶ 47} As such, the trial court's denial of the Brady claim and affirmation of the Strickland claim were mutually distinct in analysis and conclusion. Resh failed to meet the first prong of the Brady claim (failure to disclose) and, consequently, it was unnecessary for the court to reach the materiality prong. However, the trial court concluded both prongs of the Strickland test were met. Therefore, the findings of the trial court were consistent with the relevant and controlling case law.
 {¶ 48} Next, the state maintains the trial court's findings regarding Holcomb's[2] testimony, and its impact on the "false alibi" theory were clearly erroneous. The trial court's findings and conclusions state:
 {¶ 49} "At the hearing, Brenda Holcomb testified that it was raining when Gondor and Resh came into the shop. At the time, the entire area was in the midst of a severe drought and the only days it rained were on Thursday and Friday, August 18 and 19, 1988. This was evidenced by a Climatological Report covering the days in question."
 {¶ 50} The state argues the court's statement that the "only days it rained were on * * * August 18 and 19," is erroneous because the climatological report indicated rain in the area on August 5, 15, 18, 19, 25, and 28. The state is correct that the court misstated the evidence when observed in its entirety. However, to the extent the court was relying on "the days in question," the court's conclusion is accurate. That is, Holcomb indicated at trial that Resh and Gondor were in the pizza shop on August 16. However, there was no evidence of rain on August 16; the precipitation record does indicate it rained on both August 18 and 19, after Resh was interviewed by Lt. Easthon.
 {¶ 51} However, the climatological report was taken from the Akron-Canton Airport, and used as evidence of the weather conditions for the Portage County area. The report offers no evidence of rainfall for the specific area in question. It is impossible to assume the weather at the Akron-Canton Airport was the same or even similar to that in Portage County; therefore, the climatological report had little value. The trial court's reliance on the climatological report was clearly erroneous.
 {¶ 52} Finally, the state attacks the trial court's description of a July 6, 1990 Serological Research Institute ("SERI") report authored by Chief Forensic Serologist Brian Wraxall ("Wraxall"). Specifically, the trial court found that:
 {¶ 53} "* * * Dale Laux of the Bureau of Criminal Investigation * * * testified that stains found in the bed liner [sic] of Gondor's pickup truck were human blood. This testimony was very important because it corroborated the testimony of Troy Busta about putting Connie Nardi's body in the bed of Gondor's truck. At the time of trial, the Prosecution also had a report from the Serological Research Institute, Richmond, California dated July 6, 1990, which, after describing the tests performed, ruled out blood stains [sic] and stated that the stains were `most likely perspiration.' This report was not used at either trial, although the testimony established that both defense counsel, by phone call from Ron Craig, Prosecutor's Investigator, and in person by David Norris, Prosecutor, were notified of its existence."
 {¶ 54} The state correctly notes the SERI report was inconclusive as to the nature and origin of the bloodstain. Wraxall's report explained that the sample contained no Gamma (Gm) or Kappa (Km) markers, stable genetic markers found in blood serum as well as other bodily fluids. Further, Wraxall's report notes DNA is found in white blood cells, sperm cells, saliva, vaginal cells, and tissue epithelial cells; however, no DNA was found in the sample taken from the truck. Despite this, Wraxall consistently referred to the sample taken from Gondor's truck as a "bloodstain."
 {¶ 55} The trial court failed to expressly acknowledge these competing characterizations in the 1990 SERI report. Instead, the trial court mischaracterized the 1990 SERI report when it explicitly found it "ruledout blood stains and stated that the stains were `most likelyperspiration.'" (Emphasis added). The 1990 SERI report neither overtly nor implicitly makes such categorical assertions. The trial court's entry should have reflected that the SERI report was inconclusive. The failure to do so was error in that the trial court overstated the potential value of the evidence.
 {¶ 56} We note that a 1991 letter addressed to Gondor and a 1996 affidavit, both from Wraxall and Wraxall's April 30, 2001 deposition, were admitted at the postconviction hearing. In the affidavit, Wraxall stated he now believed his testing revealed that the substance might have been derived from some fluid or tissue other than blood. This conclusion was echoed in Wraxall's 2001 deposition. Specifically, Wraxall's affidavit stated:
 {¶ 57} "[t]he best interpretation of these results is that the presumptive tests are false positives, and the human protein originated from some human body fluid that does not contain DNA or serum proteins. The body fluid that best fits this scenario is perspiration."
 {¶ 58} It is clear the trial court's finding falsely attributed language found only in Wraxall's 1996 affidavit and 2001 deposition to the 1990 SERI report. The 1996 affidavit containing the conclusion on which the trial court relied did not exist at the time of Resh's trial. This belies the trial court's statement that "[i]t must be noted that the evidence presented at the hearing and referred to hereinafter was in existence at the time of both trials." In our view, the trial court's conclusions of law regarding the blood evidence presented at trial were clearly erroneous as they were premised on evidence that did not exist at the time of the trial.
 {¶ 59} We hold that the trial court's findings of fact and conclusions of law were sufficiently comprehensive and pertinent to the issues raised with respect to: (1) the date of the Nardi homicide; (2) the alleged inconsistencies within the trial testimony of Resh and Gondor; and (3) the consistency of the trial court's resolution of the Brady and ineffective assistance issues. However, we hold the trial court's findings of fact and conclusions of law were inadequate and clearly erroneous regarding: (1) the climatological report (2) the summary of the 1990 SERI report; and (3) the finding that specific evidence presented at the time of the hearing and referred to in the judgment entry existed at the time of Resh's trial. For these latter reasons, the state's first assignment of error has merit.
 {¶ 60} We review the state's third and fourth assignments of error together as both include an analysis of the manifest weight of the evidence. Under its third assignment, the state argues the trial court erred by overruling its Civ. R. 41(B)(2) motion to dismiss Resh's ineffective assistance claim; under its fourth assignment, the state contends the trial court's decision granting Resh relief on his ineffective assistance claim was against the manifest weight of the evidence.
 {¶ 61} Pursuant to Civ. R. 41(B)(2), a defendant may, after the plaintiff has presented his evidence and rested, move for a dismissal of the action on the ground that, upon the facts and law, the plaintiff has failed to show a right to relief. L.W. Shoemaker, M.D., Inc. v. Connor
(1992), 81 Ohio App.3d 748, 752. In ruling on a Civ. R. 41(B)(2) motion to dismiss, the trial court determines whether the plaintiff proved the necessary facts by the necessary quantum of proof. Lance-Sepesiv. Goris, 6th Dist. No. WD-02-028, 2003-Ohio-1622, at ¶ 9. The conclusions of the trial judge may not be set aside unless they are erroneous as a matter of law or against the manifest weight of the evidence. Connor, supra at 752. Judgments supported by some competent, credible evidence going to all essential elements of the case will not be reversed as against the manifest weight of the evidence. Sharaf v.Youngman, 10th Dist. No. 02AP-1415, 2003-Ohio-4825, at ¶ 8, citing C.E.Morris Co. v. Foley Constr Co. (1978), 54 Ohio St.2d 279, syllabus.
 {¶ 62} The state alleges Resh's claims were not supported by competent, credible evidence going to all essential elements of his ineffective assistance of counsel claim. Therefore, the state argues the trial court's decision to overrule its Civ. R. 41(B)(2) motion was against the manifest weight of the evidence.
 {¶ 63} The Sixth Amendment to the United States Constitution
guarantees the right to effective assistance of counsel. The purpose of this guarantee is to ensure criminal defendants receive a fair trial and ensure a defendant has the assistance necessary to justify reliance on the outcome of the proceeding. Strickland, supra at 691-692.
 {¶ 64} When we review an ineffective assistance claim, the benchmark is "[w]hether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id. at 686. To prevail on a claim of ineffective assistance, Resh must show his counsel's performance was deficient. "This requires showing that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed by the Sixth Amendment." Id. at 687. Resh must also show prejudice resulting from the deficient performance. Id. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. Resh must show "* * * that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. We presume counsel's conduct was within the wide range of reasonable professional assistance. Id. See, also, State v. Bradley (1989),42 Ohio St.3d 136, 143.
 {¶ 65} We need not address the two prongs of Resh's ineffective assistance claim in the order set forth in Strickland.
 {¶ 66} "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Strickland, supra at 697.
 {¶ 67} The state contends Draper's failure to present the evidence in question was a reasonable trial strategy and Resh failed to overcome the strong presumption favoring this conclusion. The state argues that although Resh's ultimate defense was total innocence, Draper voluntarily pursued an alibi defense. The state maintains Draper's pursuit of the alibi defense demonstrates his intentional decision to avoid all other avenues of defense. The state indicated at the post-conviction hearing:
 {¶ 68} "When a defense attorney uses an alibi theory, he somewhat boxes himself into deciding what he's going to present to the jury and what he's not. Because you don't want to lose credibility with the jury by arguing all kinds of alternative theories. He went with an alibi theory, which would explain why he did not pursue certain types of evidence as specific trial tactics."
 {¶ 69} In the state's view, Resh was not denied effective assistance of counsel because Draper chose, for strategic reasons, not to pursue every possible trial tactic. State v. Brown (1988), 38 Ohio St.3d 305, 319. Thus, the state concludes the trial court erred when it denied its Civ. R. 41(B)(2) motion because Resh had failed to overcome Strickland's presumption that Draper's failure to utilize the evidence was nothing more than a reasonable trial strategy.
 {¶ 70} Resh contends Draper's failure to present evidence, in light of Resh's defense of innocence, was a result of Draper's failure to conduct a reasonably complete investigation. As such, no reasonable trial strategy could support his decision. The failure to present the evidence, consequently, prejudiced Resh such that the outcome of his trial was fundamentally unworthy of trust. We disagree with Resh's contentions, but not necessarily for the reasons enunciated by the state.
 {¶ 71} The trial court relied on the following evidence in determining Resh had received ineffective assistance of counsel:
 {¶ 72} False Alibi Evidence
 {¶ 73} During the 1990 trial, the state presented evidence Resh and Gondor contrived alibis to Nardi's homicide before they knew they were suspects, to wit: Nardi was killed on Sunday, August 14, 1988; Resh and Gondor ordered a pizza from Domino's following the crime; Gondor contacted Domino's on Monday, August 15, 1988 to obtain a receipt from the previous night's order. The state presented evidence that both Resh and Gondor went into the Domino's store on Tuesday, August 16, 1988 to verify the Sunday order. The state argued Resh and Gondor's order verification was an attempt to establish an alibi before they had been labeled official suspects.[3] The state concluded their actions were evidence of their "guilty knowledge" of a crime to which they had not yet been officially connected.
 {¶ 74} At the post-conviction hearing, Resh presented evidence challenging the state's "false alibi" theory. Specifically, Resh presented evidence that Rick Hollibaugh ("Hollibaugh") and Holcomb were working at Domino's when Resh and Gondor picked up their pizza on the night of the murder. Craig interviewed Hollibaugh on March 6, 1990 and established Hollibaugh was working with Holcomb the evening Resh and Gondor returned to confirm their order. Domino's work records from Sunday, August 14, 1988, through Sunday August 21, 1988, show the only date after August 14, 1988 Holcomb and Hollibaugh worked together was Friday, August 19, 1988 — after authorities had contacted both Resh and Gondor regarding the Nardi homicide.
 {¶ 75} Moreover, Holcomb's grand jury testimony and her testimony at the postconviction hearing indicate it was raining when Resh and Gondor returned to confirm their order. Resh presented a climatological report from the Akron-Canton Airport for August 1988. This report showed it rained August 5, 15, 18, 19, 25, and 28. Resh claimed this report, in conjunction with Hollibaugh's testimony and the work records, indicated the only time he and Gondor could have returned to Domino's was Friday, August 19, 1988 — after they were interviewed by authorities.
 {¶ 76} Further, Resh presented Gondor's phone records to show the only call from Gondor's telephone to Domino's was placed on Thursday, August 18, 1988. Thus, according to Resh, the phone records show he and Gondor began to "re-trace" their steps after being interviewed by police.
 {¶ 77} Draper testified that his trial strategy centered on Resh's total innocence. He stated this evidence would have "destroyed" the state's false alibi evidence. Draper testified at the post-conviction hearing that he neither received nor saw the Domino's work records or the interview between Hollibaugh and Craig. Draper also failed to obtain Holcomb's grand jury testimony indicating it was raining when Resh and Gondor returned to the shop. Draper testified that if the foregoing evidence was available and he failed to use it, he would have rendered ineffective assistance.
 {¶ 78} Although this evidence arguably shows Resh and Gondor did not return to Domino's until after authorities contacted them, it does not deflate the state's contention that the co-defendant's acted with "guilty knowledge" of the murder.
 {¶ 79} When Easthon interviewed Resh on August 17, 1988, he did so to obtain information from an ostensible eyewitness; at that point, Resh and Gondor were not suspects. At the post-conviction hearing, a complete transcript of Easthon's August 17, 1988 interview with Resh was presented. During the interview, Easthon explained he was speaking with Resh only to gather information regarding what he saw on the night in question. Easthon neither adopted an accusatory tone nor gave Resh any reason to believe he was a suspect. Nothing in the interview suggests Resh was a suspect. However, during the interview, without being asked, Resh produced his Domino's receipt to "prove" his whereabouts at 12:42 a.m. on the night of the murder. This spontaneous gesture supported the state's theory that Resh had guilty knowledge of the homicide when he and Gondor returned to Domino's to verify their order.
 {¶ 80} Further, the record suggests that, although Resh became a suspect "in Easthon's mind" after Easthon interviewed Gondor on August 18, 1988, Resh and Gondor were not official suspects before August 19, 1988. Whether Resh and Gondor went to Domino's on Tuesday, August 16, 1988, or Friday, August 19, 1988, is irrelevant. When they confirmed their order they told Holcomb they were being investigated for a murder, yet neither Resh nor Gondor had been told he was being investigated for murder.
 {¶ 81} The record of Resh's 1990 trial reveals Draper presented substantial alibi evidence in an attempt to account for Resh's whereabouts between the hours of 5:45 p.m. and 12:00 a.m. This evidence was presented through the testimony of Douglas and statements made by Maryann Walter, a bartender at the Village Bar. The jury obviously rejected this evidence. Thus, even if Draper should have presented the omitted evidence to counter the state's false alibi theory, Resh suffered no prejudice. In other words, Draper presented alibi evidence to account for Resh's whereabouts at the time the state alleged Nardi was murdered. Any evidence Draper could have presented to counter the state's false alibi theory based on Resh and Gondor's confirmation of their Domino's order would have had little or no value.
 {¶ 82} The omitted evidence does not undermine the state's claim and Resh has failed to demonstrate he suffered prejudice from Draper's omission of this evidence.
 {¶ 83} Blood Evidence
 {¶ 84} During the 1990 trials of Resh and Gondor, the state presented evidence that human blood was found on the bed liner of Gondor's truck. Busta testified that after Nardi was murdered, they placed her body in the back of Gondor's truck, in the general area where the bloodstains were found. The invisible bloodstain evidence was provided through the testimony Laux, a criminalist with B.C.I.
 {¶ 85} In addition, the state had the alleged bloodstains tested by SERI. As we discussed above, the SERI report was inconclusive for the presence of blood and did not reveal the presence of DNA. In spite of this, Wraxall referred to the sample as "blood" throughout the report even though the report stated, "No conclusion can be drawn regarding the Gm, Km, or DQ type of the blood from the truck." Neither the report nor Wraxall's testimony was presented to the jury.
 {¶ 86} Resh presented Wraxall's 2001 videotaped testimony at the postconviction hearing. In his testimony, Wraxall indicated his test, when considered in relation to Laux's tests, established only that the substance in the truck's bed liner contained human protein. Wraxall indicated the best scientific conclusion that could be drawn from the tests was that the substance was human perspiration, not blood. Wraxall stated that had he been contacted by the defense and informed about Laux's tests, he would have testified the same way at the 1990 trials.
 {¶ 87} Draper testified he did not receive or see Wraxall's report before or during Resh's trial. Draper claimed the report was significant because the absence of the markers and DNA suggested the substance in Gondor's truck was not blood. Draper testified that if he had Wraxall's report, he would have contacted Wraxall, as his professional obligation would demand.
 {¶ 88} Even assuming Draper should have presented the 1990 SERI report to the jury his failure to do so did not prejudice Resh. Draper vigorously argued against the admission of blood evidence because the blood could be neither typed nor dated. Laux was only able to testify that he thought the stain was human blood. Laux was unable to identify the donor and could not state how or when the stain was deposited. Further, Draper suggested to the jury that the stains were not human blood by qualifying several questions with the phrase "if this is human blood." Draper's cross-examination of Laux effectively assailed the probative value of the blood evidence.[4]
 {¶ 89} Both the trial court and the dissent in this case characterize the SERI report and Wraxall's testimony as "exculpatory." The use of this term when referring to the evidential value of this evidence is improper. Black's law dictionary defines "exculpatory evidence" as "* * * evidence which tends to justify, excuse or clear the defendant from alleged fault or guilt." Black's Law Dictionary (6th Ed.), 566. The evidence at issue, while of some value, does not rise to the level of exculpatory evidence. It simply would have given the jury an alternative theory, i.e., a theory that the stain was not blood. Defense counsel adequately presented this theory to the jury through the cross-examination of Laux.
 {¶ 90} Although Draper did not use the 1990 SERI report, its findings were inconclusive and consistently referred to the sample as a "bloodstain." Further, although Draper failed to contact Wraxall regarding his July 6, 1990 report, he thoroughly cross-examined Laux on his inability to identify whose blood was found or when it was left in the bed liner. Draper was not ineffective for failing to use the 1990 SERI report as his cross-examination acted to summarize the substantive conclusions of the report. Draper's cross-examination of Laux undermined the persuasive value of the blood evidence; therefore, Resh did not suffer prejudice from Draper's failure to use the SERI report.
 {¶ 91} Evidence Resh did not participate in the Nardi homicide.
 {¶ 92} Resh also offered evidence at the post-conviction hearing of six witness statements, which were not presented to the jury during his 1990 trial.
 {¶ 93} First, Donna Sabarese ("Sabarese"), provided police with a statement regarding an encounter she had with three men several hours after Nardi was murdered. Sabarese stated that in the early morning hours of Monday, August 15, 1988, she was delivering newspapers in the general vicinity where Nardi's body was found. Sabarese indicated she was approached by three men who declared they were looking for a missing girl. Sabarese warned the men to stay away from her and, although she described them as agitated and upset, they left. Sabarese recalled that the men were carrying pipes because, as they left, she heard what she described as a "tinny" sound as something hit the ground. During a search of the area where the encounter took place, police found a metal strut and a blue broom handle.
 {¶ 94} Also in the prosecutor's file was a telephone interview conducted by Easthon with Douglas, the owner of the Upper Deck bar. In the interview, Douglas told Easthon he had information that Busta and Nardi went to a party the night of August 14, 1988 where two other men, Eddie Price and Bennett Nelson, were present. In response, Easthon stated: "[w]ell, we haven't spoken to these two guys. Yeah, we're beyond that. We're in the more critical stages now." The trial court held this report could have been used to impeach Easthon's testimony by showing he failed to follow up on a potential lead and to lend credibility to evidence indicating Busta committed the offense with two men other than Gondor and Resh.
 {¶ 95} Resh also presented a police report containing a statement of Pauline and Fred Green ("the Greens"). The Greens lived at the corner of Allyn and Abbot Roads; on the opposite side of the river from where Busta testified the crime occurred. The Greens stated that at approximately 6:00 or 7:00 p.m. on August 14, 1988, they saw a man and a woman on a dark motorcycle down by the river with a male on a yellow dirt bike and another male on a motorcycle. Mrs. Green stated that around 11:30 p.m. that night, she saw two people on a motorcycle, which she believed to be the same dark motorcycle she saw earlier, throw something into the weeds near her home. The next day, Mrs. Green retrieved two full cans of Pabst beer, one empty Pabst beer can, one full bottle of Corona beer, and one empty Corona beer bottle from the weeds.
 {¶ 96} The trial court found that Mrs. Green's statement corroborated Busta's testimony regarding the time he threw out the remnants of the beer; however, the trial court found it also fundamentally contradicted Busta's story. The trial court stated "[i]t could have been used by defense counsel to show that Busta had lied about the location of the crime, and he may have committed the crime with two other people on motorcycles." Further, the trial court noted Mrs. Green did not see a white pick-up truck, but did see two people on a motorcycle around 11:30 p.m. dumping something into the weeds. According to Douglas, both Gondor and Resh were at the Upper Deck at 11:40 p.m.
 {¶ 97} Resh also presented a statement given by Mr. and Mrs. Thomas ("the Thomases"), who resided on the first piece of property north of the purported scene of the homicide. They stated they did not see Busta on a motorcycle nor did they see a white pick-up at any time on the day of the homicide. The trial court stated, "[t]his report might have been used to refute Busta's story about where the offense occurred."
 {¶ 98} Draper testified that, had he received these reports, no reasonable trial strategy could justify their omission from evidence. Draper also testified that he failed to review the telephonic interview between Easthon and Douglas indicating Busta was seen with two other people at the party the night of the homicide. Draper concluded such evidence would have been useful for undermining Easthon's investigation to the extent he failed to follow potential alternative leads. We disagree.
 {¶ 99} First, the Thomases' report has no bearing on Resh's defense and thus offers little support to Resh's claim of ineffective assistance. The Thomases, who lived near the scene of the crime, stated they never saw Busta on his motorcycle and never saw a white pick-up truck on the day of the murder. However, the Thomases' failure to observe these vehicles does not prove Resh, Gondor, and Busta were not there at some point in the night. Therefore, as we indicated in State v. Resh
(1997), 124 Ohio App.3d 694 the Thomases' report is at best marginally favorable. Draper was not ineffective for failing to present this evidence.
 {¶ 100} Next, evidence established that Douglas provided Easthon with information regarding two other individuals who Busta may have had contact with earlier on the night of the murder. Draper did not use this report and the trial court held he could have done so to impeach Easthon's testimony as well as the credibility of the investigation. When observed in its entirety, the content of the Douglas information is vague and lacks an explicit nexus to the crime. Due to its generality, it is unclear how Douglas' statement is exculpatory. In any event, Draper specifically challenged Easthon's investigative style and its variance from police procedures. Utilizing the Edwards statement would have been redundant as Draper presented significant evidence to the jury of Easthon's suspect credibility. Resh failed to show he suffered prejudice because of his counsel's failure to present this cumulative evidence.
 {¶ 101} Next, the Greens stated they saw a male and a female on a dark motorcycle, another man on a motorcycle, and a third on a yellow dirt bike at approximately 6:00 p.m. or 7:00 p.m. on the night of the murder. Further, Mrs. Green indicated that, around 11:30 p.m., she saw two people on what she believed was the same dark motorcycle throw something into the weeds near her home. She later investigated and retrieved three cans of Pabst and two bottles of Corona.
 {¶ 102} The trial court determined this information would necessarily bear on the outcome of the case as Draper could have used it to show Busta had lied about the location of the crime and he may have committed the crime with two other people on motorcycles. We conclude this evidence is marginal and cumulative.
 {¶ 103} The record reflects the defense challenged the police investigation. Further, Draper's cross-examination of Busta illustrated Busta was a liar whose version of the events changed. The jury was aware of the state's credibility problems and Resh suffered no prejudice from Draper's failure to present cumulative credibility evidence. In our view, the report is not exculpatory and even had Draper used it, its impact would be tenuous in light of Draper's attack on Easthon's and Busta's credibility.
 {¶ 104} Finally, the incident described by Sabarese has no bearing on Resh's defense. The trial court referenced the incident but failed to state how Draper's failure to use it prejudiced Resh.
 {¶ 105} Hindsight may not be used to distort the assessment of what was reasonable in light of trial counsel's perspective at the time. Statev. Cook (1992), 65 Ohio St.3d 516, 524-525. The fact Draper did not aggressively pursue the "alternative perpetrators" defense does not render his assistance ineffective. Draper soundly impeached Easthon's investigation and methodology by pointing out, inter alia, his deviation from proper police procedures.[5] Accordingly, Resh suffered no prejudice from Draper's failure to use Sabarese's statement.
 {¶ 106} The above statements neither directly nor necessarily affect Resh's defense and Resh has failed to demonstrate how he was prejudiced by Draper's failure to use them.
 {¶ 107} Evidence affecting Busta's credibility not introducedat trial
 {¶ 108} On September 11, 1988, a police report was filed based upon Busta's mother's attempt to smuggle a knife into the Geauga County Jail for her son. The trial court stated such evidence might have been used to show that Busta's incriminating testimony against Resh and Gondor was motivated by his concern that his mother would face prosecution. This report was in the prosecutor's file, but not utilized by the defense.
 {¶ 109} Further, a transcript of an interview between Busta, his lawyers, and his investigator was introduced at the post-conviction hearing. The trial court found the transcript revealed pressure being exerted on Busta to decide on what he would tell police and Busta's initial uncertainty as to the facts of the murder. In this interview, Busta denied seeing anyone strike or rape Nardi. Further, Busta indicated he did not know why Resh and Gondor were throwing wood from Gondor's truck, but stated the wood was clean, i.e., implying it was not bloodstained.
 {¶ 110} Busta's attorney asked him whether he would be willing to "set up" Resh and Gondor for Easthon. Busta replied, "I'd do anything I have to do to get myself out of this. I ain't sitting in no chair for somebody else. I'm not going to sit in jail for somebody else." Busta stated that Easthon felt Resh and Gondor were involved but they only had evidence against him and would only prosecute him. At trial, Busta testified Resh and Gondor struck Nardi while Resh attempted to rape her.
 {¶ 111} At the post-conviction hearing, Dr. Richard Ofshe, an expert in police interrogations and false confessions, testified that Busta's eventual trial testimony was the culmination of pressure applied to him, information given to him, and motivations created for him, that made Busta's testimony wholly unreliable.
 {¶ 112} Draper testified he never saw Busta's interview. He stated the interview would have been crucial for impeaching Busta's credibility and the integrity of the homicide investigation. Draper also testified that the police report filed against Busta's mother would have been powerful for attacking Busta's motives for testifying as he did in relation to his interview testimony. Draper concluded that if he had the police report and the interview evidence and failed to use it, "I still wouldn't be sleeping at night."
 {¶ 113} Resh has failed to show he suffered prejudice because of the omission of this evidence. Draper conducted an incisive cross-examination of Busta at trial. Draper asked whether he was compelled to lie; in response, Busta testified "[w]hen your life is being threatened, yes." Further, Busta testified during trial that he changed his story in reaction to the responses suggested by investigators. While Busta's interview demonstrated the suggestiveness of the investigation, it also demonstrated that Busta maintained through out the interview that he did not want to be punished for someone else's crimes. The only others he identified as being involved were Resh and Gondor.
 {¶ 114} The jury was well aware of Busta's penchant for lying and changing his story. Therefore, Draper's omission of the interview did not prejudice Resh because it only underscored Busta's credibility problems, problems of which the jury was well aware; and emphasized Busta's testimony that Resh and Gondor committed the crimes.
 {¶ 115} Resh also challenged Draper's failure to attack Busta's credibility with evidence of Kay Busta's attempt to smuggle a knife to her son while he was in jail. The trial court's conclusion that Draper could have used this report to show Busta's testimony was motivated by an interest in saving his mother from prosecution is wholly speculative. Nothing in the record indicates Busta cooperated with the state so that his mother might avoid prosecution. In fact, the fifty-page interview discussed above occurred on September 14, 1988, three days after the report was filed against Busta's mother. It is equally likely that if the police were interested in inducing Busta's cooperation through a promise his mother would not be prosecuted, such discussions would have occurred during the interview. There is no such indication.
 {¶ 116} In any event, the evidence of the police report relating to Kay Busta goes to Busta's credibility. As we discussed, Draper severely attacked Busta's credibility at trial. The record reveals Busta was portrayed as a very desperate man whose version of facts differed virtually every time he gave a statement to anyone involved in the investigation. In spite of this, the jury still chose to believe him. Draper was not ineffective for failing to raise every conceivable piece of evidence relating to Busta's credibility. Thus, Resh has not demonstrated he was prejudiced by the omission of this cumulative evidence.
 {¶ 117} Conclusion
 {¶ 118} At the post-conviction hearing, Draper characterized his own assistance as ineffective. However, the sole criterion of effectiveness is not acquittal. See, State v. Hunt (1984), 20 Ohio App.3d 310, 311. A properly licensed attorney is presumed competent. Vaughn v. Maxwell
(1965), 2 Ohio St.2d 299, 301. Any questions regarding the ineffectiveness of counsel must be viewed in light of the evidence against the defendant with a strong presumption that counsel's conduct is within the broad range of professional assistance. See, e.g., Bradley,
supra, at 142-143. Resh has failed to rebut this presumption.
 {¶ 119} Draper's cross-examinations of Easton and Busta revealed the inherent credibility problems within the state's case. Notwithstanding these problems, the jury still believed Busta, trusted Easthon's investigation, and convicted Resh. Although it is obvious that a defense attorney whose client is convicted would act differently if given a second chance, such hindsight does not mean the defendant received ineffective assistance of counsel. Even if Draper should have included the information gleaned from the evidence presented at the post-conviction hearing, Resh has failed to demonstrate he suffered prejudice as a result. That is, notwithstanding the omission of the evidence discussed, the original jury verdict is reliable and worthy of confidence.
 {¶ 120} We therefore hold Resh did not receive ineffective assistance of counsel. The state's third and fourth assignments of error have merit.
 {¶ 121} For the foregoing reasons, the state's first, third, and fourth assignments of error are sustained. Thus, the judgment of the Portage County Court of Common Pleas granting Resh post-conviction relief is reversed.
Degenaro, J., Seventh Appellate District, sitting by assignment, concurs,
O'Neill, J., dissents with Dissenting Opinion.
[1] Resh's attorney, James Owen, Chairman of the Ohio Public Defender's Commission, worked closely with Gondor's attorneys — the public defender's office, during the discovery process and through the commencement of the joint post-conviction hearing. Busta sought to intervene to protect privileged information from being disclosed by the Ohio public defender's office, which had represented Busta.
[2] Holcomb was an employee of Domino's.
[3] Resh was contacted and interviewed by Lieutenant David Easthon ("Easthon") on August 17, 1988 regarding the Nardi homicide. As such, if Resh and Gondor were confirming their whereabouts for the night of the murder before August 17, such evidence would support the state's "false alibi" theory.
[4] As indicated in our analysis of the state's first assignment of error, Resh cannot base an ineffective assistance of counsel claim on evidence that did not exist. The 1991 letter and 1996 affidavit from Wraxall and the April 30, 2001 deposition did not exist at the time of the trial. Thus, the trial court erred when it relied on Wraxall's 1996 testimony indicating the stains were not blood, but "more likely perspiration."
[5] In particular, Draper noted inconsistencies in the procedure of taping Resh's interview and not Gondor's interview, his failure to pursue certain leads established by the Sabarese statement, and his failure to conduct an analysis of Busta's clothing against pond soil samples.