The STATE of Ohio, Appellee,

v.

RESH, Appellant.

[Cite as *State v. Resh* (1997), 124 Ohio App.3d 694.]

Court of Appeals of Ohio,
Eleventh District, Portage County.

Nos. 96–P–0262 and 97–P–0018.

Decided Dec. 22, 1997.

*Victor V. Vigluicci*, Portage County Prosecuting Attorney, and *Thomas R. Buchanan*, Assistant Prosecuting Attorney, for appellee.

*James D. Owen*, for appellant.

NADER, Judge.

This is an appeal from a judgment of the Portage County Court of Common Pleas denying the petition for postconviction relief filed by petitioner-appellant, Randy Resh.

On June 26, 1990, Resh was convicted of the murder and attempted rape of Connie Nardi. He was sentenced to fifteen years to life for the murder and a consecutive term of five to fifteen years for the attempted rape. Resh has consistently maintained that he is innocent of these charges. His convictions were secured largely on the eyewitness testimony of Troy Busta, an alleged accomplice.

This is the story Busta told police. On Sunday, August 14, 1988, at about 5:30 in the afternoon, Busta went to Ed's Upper Deck, a bar in Mantua, Ohio. While at the bar, he met and danced with Connie Nardi. About a half an hour later, Resh came into the bar with a friend, Robert Gondor. Busta and Resh knew each other from school and from several roofing jobs they did together. Busta sold Resh a quarter gram of cocaine in a side area of the bar. Later, they met in the men's room, where they snorted cocaine and discussed Busta's chances of having sex with Nardi.

At approximately 7:00 p.m., Busta took Nardi on a motorcycle ride to cool off. They drove to a washed-out bridge formerly across the Cuyahoga River on Allyn Road. The couple talked for about forty-five minutes, but they did not have sex. They returned to the bar.

Resh and Busta again met in the men's room, where Busta falsely bragged about having sex with Nardi. Resh asked if Busta could persuade her to return

to the river and to have sex with Resh. Busta thought it was possible, since she seemed, in his words, "pretty easy." They planned for Busta to buy a six-pack of beer and take Nardi back to the river. Resh and Gondor would follow about fifteen or twenty minutes later.

They stayed in the bar until about 8:30 p.m., when Busta bought a "split six" of beer—three Coronas and three Pabsts. He then took Nardi on his motorcycle back to the river. They sat drinking the beer for a while. Fifteen or twenty minutes later, Resh and Gondor arrived in Gondor's white Ford pickup truck. Busta said they were drunk and staggering. After some small talk, Resh asked Nardi if she would have sex with all three men. When Nardi refused, Resh became angry. He grabbed Nardi and threw her down, telling Busta and Gondor to hold her hands and feet. Resh sat on Nardi's stomach, while Nardi struggled to free herself. She loudly ordered them to stop, to let her go. Gondor stripped off her shorts and underwear. When her leg came loose, Nardi kicked Gondor. Resh struck her several times on each side of her head, but she continued to struggle. Resh then choked her to death while the other two held her down.

Resh stood up and said, "We've got problems." He wanted to dump her body into the adjacent river, but Busta suggested they take it to the pond on Rapids Road. They loaded the body into the back of Gondor's pickup on top of a pile of two by fours. Gondor drove his truck and Busta drove his motorcycle to Rapids Road, where Resh and Gondor dumped the body into the pond. Busta dropped her purse into a nearby ditch. They separated. Busta drove his motorcycle and disposed of the Corona and Pabst bottles on the opposite side of the bridge, in the weeds near the intersection of Abbott and Allyn Roads.

Busta returned to the Upper Deck. Resh and Gondor had also returned and were drinking more beer. They stayed until closing time, midnight. When they went outside to Gondor's truck, they noticed that some of the pieces of wood had blood on them. They tried to discard the wood by throwing it across the street into the parking lot of another bar, the Corner Saloon. The bartender came out of the saloon, ordering them to stop throwing the wood or he would call the police. The three men left.

They went to Busta's father's house in order to drink more beer. At the time, Busta lived in a trailer on his parents' property with a roommate, Joey Moore. Busta's father came out to scold him about not doing chores. Resh and Gondor did not go inside, but left when they heard Mr. Busta's tirade. Resh warned Busta not to talk about the murder.

On cross-examination, defense counsel attacked Busta's credibility. In response, Busta made unsolicited comments implying that he had passed a lie detector test. In truth, he had taken a test, but the parties had not stipulated

that it be admitted. Defense counsel did not move for a mistrial at that point.[1] It was also brought out on cross–examination that Busta had struck a deal with the prosecution wherein they agreed to drop death penalty specifications if Busta agreed to testify against Resh and Gondor.

The state bolstered its case by presenting corroborating evidence and associated testimony. Nardi's body was discovered in the Rapids Road Pond by a fisherman on Monday, August 15, 1988, where Busta testified they dumped it. She was found wearing only a blouse and short boots, which was consistent with Busta's testimony that Gondor removed her shorts and underwear. Furthermore, the state called Dale Laux, a laboratory technician at the Bureau of Criminal Investigation, who performed a "crossover electrophoresis" test on the bedliner of Gondor's pick-up truck and testified that he discovered human blood stains near the tailgate.

Resh's version of events was significantly different. He testified that he went to Ed's Upper Deck at 7:00 p.m. on Sunday, August 14, 1988. He saw Nardi dancing with Busta. He said that he never spoke with Busta in the bar and denied doing cocaine with him. He saw them leave the first time and return, but paid them little attention. Resh claimed that he and Gondor left the Upper Deck at about 10:00 p.m. and went to another bar called the Village. He denied going to the washout on Allyn Road. He and Gondor stayed at the Village bar just long enough to have a few beers and drink a few shots. They returned to the Upper Deck at 11:00 p.m., where Resh again saw Busta. Resh admitted that he and Gondor went outside and threw pieces of wood at the other saloon but failed to explain the behavior. He denied that there was blood on the wood. He and Gondor then went home and at 12:42 a.m. ordered a pizza from the Domino's in Streetsboro. They picked up the pizza, went home, ate it, and fell asleep. Resh denied murdering Nardi and claimed that he first heard about her death on Wednesday, August 17, 1988, while he was at the Upper Deck

Later that day, Lieutenant Easthon and Sergeant Dewey of the Geauga County Sheriff's Department interviewed him at his trailer. He originally told Easthon that he followed Busta home on the night in question, but he wasn't sure because he was drunk. Subsequently, he recanted that statement on Thursday, August 18, 1988, telling police, in another interview, that he did not follow Busta home. Because he gave inconsistent accounts of his whereabouts, Resh became a suspect in Nardi's murder.

---

1. Defense counsel made a motion for mistrial when the prosecutor mentioned the polygraph during closing argument. The court overruled it because the jury had already heard, during his cross-examination, that he took and allegedly passed a polygraph test. Curiously, Busta also made the same "spontaneous" utterance regarding this polygraph test while under cross-examination in Gondor's trial.

Resh relied heavily on testimony from a witness from the Village bar and the fact that Gondor ordered a pizza for them from the Streetsboro Domino's to corroborate their alibi. At some point in the week after the murder, Resh and Gondor visited the barmaid at the Village to ask if she had remembered that they were in the bar the previous Sunday. Gondor called the manager of the Streetsboro Domino's to ask whether he still had the sales slip from their order. As a result of this phone call, the manager placed Gondor's name on the sales slip. Resh and Gondor then visited the Domino's to ask whether any of the employees remembered that they were there the previous Sunday. They said it was important because there was a murder and they were in trouble. The state produced a witness, Brenda Holcomb, a Domino's employee, who testified that Resh and Gondor came to visit on Tuesday, August 16, 1988, *before* they knew that they were suspects in the crime. The state argued that the only way Resh and Gondor could have known about the murder on Tuesday is if they were involved. Resh argued that he visited the Domino's *after* he knew he was a suspect, on Thursday, August 18, 1988. On this evidence, the jury convicted Resh.

Shortly thereafter, Resh filed a motion for a new trial, alleging that newly discovered evidence "totally destroyed" the prosecution's case. It was supported by a copy of Gondor's phone records showing that the only call he made to the Streetsboro Domino's was on Thursday, August 18, 1988. The trial court overruled the motion.

Resh appealed,[2] asserting *inter alia* that his trial counsel was ineffective and that his conviction was against the manifest weight of the evidence. We affirmed the judgment of conviction. *State v. Resh* (Dec. 11, 1992), Portage App. No. 90–P–2256, unreported, 1992 WL 366992. Several points in this opinion are relevant here. We rejected the allegation that trial counsel had been ineffective for failing to request a special instruction regarding the testimony of an accomplice because the court gave a general instruction on the credibility of witnesses and because trial counsel frequently impeached Busta's credibility. Under the circumstances, we could not tell if the result of the proceedings would have been different. *Id.* at 11–12. We also held that the failure to object to Busta's statements regarding the polygraph constituted a waiver of the issue on appeal. *Id.* at 15–16. As for the weight of the evidence, we held that the jury's verdict was supported by Busta's testimony, the corroborating physical evidence (location and condition of the victim's body, her state of undress, and the blood on the bedliner of Gondor's truck), the fact that Resh could not adequately account for his whereabouts, and

---

2. Gondor also appealed, and we affirmed his conviction as an accomplice in *State v. Gondor* (Dec. 11, 1992), Portage App. No. 90–P–2260, unreported, 1992 WL 366988.

that he and Gondor tried to solidify their alibi before the police told them there was a murder. *Id.* at 17. Further, we stated that any newly discovered evidence, such as the phone record, should be used as a basis for a petition for postconviction relief. *Id.* at 13.

The Supreme Court of Ohio denied leave to appeal further. *State v. Resh* (1993), 66 Ohio St.3d 1473, 611 N.E.2d 835.

Almost four years later, Resh took our suggestion and filed a petition for postconviction relief on September 20, 1996.[3] He alleged that his constitutional rights were violated in two respects—that he did not receive the effective assistance of trial counsel as guaranteed by the Sixth Amendment and that the prosecution withheld exculpatory material in violation of his due process rights. Initially, there were no evidentiary materials attached to the petition.

A nonevidentiary hearing was set for October 7, 1996, but Resh's attorney from Columbus failed to attend. On October 10, 1996, the trial court issued a cursory judgment entry denying the petition but failing to set forth findings of facts and conclusions of law as is required by the statute.

On November 12, 1996, Resh filed (1) a motion to reconsider (in which counsel claimed he never received notice of the October 7 hearing),[4] (2) a notice of appeal from the October 10 judgment entry, which generated our case No. 96–P–0262, and (3) an "amended" petition for postconviction relief. The amended petition contained virtually the same brief in support, but unlike the earlier petition, had numerous evidentiary materials attached.[5]

On January 7, 1997, we *sua sponte* remanded the cause to the trial court with instructions to enter findings of fact and conclusions of law. On January 30, 1997, the trial court did so, and on February 21, 1997, Resh filed another notice of appeal from the January 30 judgment entry, generating our case No. 97–P–0018. On February 24, 1997, we issued a judgment entry treating the November 12, 1996 notice of appeal as a premature appeal from the trial court's judgment entry of January 30, 1997. On March 28, 1997, we *sua sponte* consolidated case Nos. 96–P–0262 and 97–P–0018 for all purposes.

---

3. This petition is timely because it was filed within one year of the effective date of the 1995 amendment to R.C. 2953.21. *State v. Broome* (Sept. 12, 1997), Geauga App. No. 96–G–2021, unreported, at 4, 1997 WL 585908.

4. On November 27, 1996, the trial court reserved ruling on the motion to reconsider as the matter was pending before this court. This motion to reconsider was eventually denied in the January 30, 1997 judgment entry.

5. R.C. 2953.21(F) allows a petitioner to amend his petition at any time prior to the filing of an answer with or without leave of court. The state never filed an answer in this case.

In his combined appellant's brief, Resh asserts the following as error:

"[1.] The trial court erred when it denied [Resh] an evidentiary hearing in violation of his rights under the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments of the United States Constitution and Article I, Sections 1, 2, 9, 10, 16 and 20 of the Ohio Constitution, when the Petitioner had attached affidavits to his amended postconviction petition which included evidence *dehors* the record.

"[2.] The trial court erred in dismissing the appellant's petition for postconviction relief without a Motion or Answer from the State and without giving notice to the Petitioner, thus violating Petitioner's due process rights under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

"[3.] The trial court erred by dismissing the Petitioner's Petition on the basis of *res judicata* because the State did not raise *res judicata* as an affirmative defense, and because Appellant relied on documentary evidence outside the record which cound [*sic* ] not have been presented on direct appeal, in violation of Appellant's rights under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution and Article I, Sections 2, 9, 10, 16 and 20 of the Ohio Constitution.

"[4.] The trial court erred because the Findings of Fact contained in the Court's Final Order and Judgment Entry of January 30, 1997 were based on an unreasonable determination of the underlying facts in light of the evidence presented in the affidavits and exhibits accompanying the postconviction petition and applicable law in violation of Appellant's due process rights under the Ohio and United States Constitutions."

In the first assignment of error, appellant contends that the trial court erred in denying his petition for postconviction relief without first conducting an evidentiary hearing.

R.C. 2953.21 provides:

"(C) Before granting a hearing on a petition [for postconviction relief], the court shall determine whether there are substantive grounds for relief. In making such a determination, the court shall consider, in addition to the petition, the supporting affidavits, and the documentary evidence, all the files and records pertaining to the proceedings against the petitioner, including, but not limited to, the indictment, the court's journal entries, the journalized records of the clerk of the court, and the court reporter's transcript.

" * * * *

"(E) Unless the petition and the files and records of the case show the petitioner is not entitled to relief, the court shall proceed to a prompt hearing on the issues even if a direct appeal of the case is pending."

From the statutory language, it is apparent that a hearing is not required in every postconviction relief proceeding but, rather, is discretionary with the trial court. *State v. Strutton* (1988), 62 Ohio App.3d 248, 251, 575 N.E.2d 466, 467–468. The court must determine whether there are substantive grounds for relief that would warrant a hearing, based upon the record and any supporting affidavits and documentary evidence before the court. *State v. Guerriero* (Sept. 26, 1997), Ashtabula App. No. 96–A–0078, unreported, at 4, 1997 WL 663512, citing *State v. Jackson* (1980), 64 Ohio St.2d 107, 110, 18 O.O.3d 348, 350, 413 N.E.2d 819, 822. Additionally, "[t]he general rule is that when determining whether there are substantive grounds for postconviction relief that would warrant a hearing, affidavits presented in support of the petition should be accepted as true. *State v. Swortcheck* (1995), 101 Ohio App.3d 770, 772 [656 N.E.2d 732, 733–734]." *Guerriero, supra,* at 5.

In the case *sub judice*, Resh presented the trial court with ten affidavits and eleven exhibits which corroborated the affidavits to support his postconviction relief petition and set forth two claims. First, he claimed that the state improperly failed to turn over to the defense material evidence that was both relevant and exculpatory. Second, Resh claimed that he was denied the effective assistance of trial counsel as guaranteed by the Sixth Amendment to the United States Constitution.

Under Resh's first claim, he asserts that the failure of the state to turn over exculpatory evidence violated *Brady v. Maryland* (1963), 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215. Generally, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. at 1196–1197, 10 L.Ed.2d at 218. In *United States v. Bagley* (1985), 473 U.S. 667, 682, 105 S.Ct. 3375, 3383–3384, 87 L.Ed.2d 481, 494, the court stated that evidence is "material" in this sense if there is a reasonable probability that, had it been disclosed to the defense, the result of the proceedings would have been different. In *Kyles v. Whitley* (1995), 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490, the court elaborated at length on the *Bagley* definition of "materiality," stating:

"Although the constitutional duty is triggered by the potential impact of favorable but undisclosed evidence, a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the

presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant).

" * * *

"*Bagley*'s touchstone of materiality is a 'reasonable probability' of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the Government's evidentiary suppression 'undermines confidence in the outcome of the trial.' *Bagley,* 473 U.S. at 678, 105 S.Ct. at 3381 [87 L.Ed.2d at 491].

"The second aspect of *Bagley* materiality bearing emphasis here is that it is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. * * * One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. * * *

"Third, we note that * * * once a reviewing court applying *Bagley* has found constitutional error there is no need for further harmless-error review. * * *

"The fourth and final aspect of *Bagley* materiality to be stressed here is its definition in terms of suppressed evidence considered collectively, not item-by-item. * * *" (Footnotes omitted.) *Kyles,* 514 U.S. at 434–436, 115 S.Ct. at 1565–1567, 131 L.Ed.2d at 506–507.

The materials submitted in support of the *Brady* claim include five pieces of evidence that were not originally disclosed to defense counsel,[6] which, when considered together, merit a hearing.

■ First and foremost, there is a report from Brian Wraxall, Chief Forensic Serologist of the Seriological Research Institute ("SERI") of Richmond, California. The state sent Gondor's bedliner to SERI for DNA testing in the hope of proving that the blood belonged to Nardi. Wraxall reported, however, that his laboratory could not find any genetic markers in these stains and hence could not conduct a DNA test. Although Crim.R. 16(B)(1)(d) requires that all scientific reports be disclosed to the defense, this report was not made available to Resh.

---

6. These documents were obtained after trial by requests under the Freedom of Information Act or were generated by independent investigation after the trial.

The trial court, in ruling on the petition for postconviction relief, held that this report was inconclusive and therefore immaterial. We disagree. Had defense counsel been informed of these test results, he could have contacted Wraxall for an explanation. Indeed, after the SERI report came to light, Resh corresponded with Wraxall, who told him in a letter that the results of the DNA tests and the absence of genetic markers, which are very durable, suggested to him that the stain was not blood. In fact, Wraxall stated that he could not even confirm that the stains were of human origin. This evidence would have directly counteracted Dale Laux's unrebutted testimony at trial that the stains were human blood. Thus, the report is relevant and exculpatory.

■ Second, there was a statement given to police investigators by Pauline Greene, who lives on Allyn Road. She told investigators that, on the night of the murder, she saw a man and a woman on a motorcycle down by the washed-out bridge at approximately 6:00 p.m. or 7:00 p.m. She also saw two other men riding two other motorcycles. At 11:30 p.m., she saw two figures on one of the motorcycles she had seen earlier throwing items into the weeds on the corner of Allyn and Abbott Roads. The next morning, Greene retrieved three cans of Pabst beer and three bottles of Corona beer from the weeds. The state did not disclose this report to the defense.

The trial court thought this report was neither exculpatory nor material. We disagree. Three aspects of Greene's statement match Busta's story: that he drove Nardi to the washout on a motorcycle at around 7:00 p.m., in order to cool off, that he purchased a split six of Pabst and Corona, and that he discarded the beer near the corner of Allyn and Abbott Roads. The points of corroboration make it highly probable that Greene actually saw Busta twice that night. However, Greene saw three motorcycles that night, not one motorcycle and a white pickup truck, as Busta claimed were present. This statement is consistent with the defense theory that Busta and two other males murdered Nardi and casts further doubt on Busta's credibility.

■ Third, there was another statement police took from Mr. and Mrs. Thomas, who live on Washburn Road on the bank of the river immediately adjacent to where Busta claimed that the murder occurred. The Thomases did not see anyone on that side of the river on the night in question. The state did not reveal this statement to the defense.

The trial court held that this statement was neither exculpatory nor material. While not as beneficial as the Greene statement, this statement does corroborate Mrs. Green's observations that Busta was on the other side of the river at around 7:00 p.m. and casts yet more doubt on Busta's credibility.

■ Fourth, there was still another statement police took from Donna Sabrese, who told investigators that she was delivering papers at approximately 4:00 or 4:30 a.m. the morning after the murder. She was approached by three young men carrying metal pipes. They told her that they were looking for a girl who was missing. The state did not disclose this statement to the defense.

The trial court found that this statement was not exculpatory because it was unreliable—Sabrese could not identify any of the men. Additionally, the court thought the metal pipes were irrelevant because the coroner testified that Nardi died of cervical compression. We do not agree. That she could not identify the men is not important. While the coroner attributed Connie Nardi's death to strangulation, the coroner also testified that she suffered premortem injuries that included bruises to her head. These bruises may have been caused by blows from a pipe. Since the defense was not aware of Sabrese's statement, they were not able to effectively cross-examine the coroner regarding this possibility. Three young men were spotted carrying metal pipes in the general vicinity of the murder in the early morning hours of August 15, 1988, at a time when Resh had an alibi. They claimed to have been looking for a girl. This can only be considered evidence favorable to the defense.

■ Fifth, and last, there was an affidavit by Victoria Buckwalter, a private investigator, who stated that she interviewed Busta in prison. She reported that Busta told her that part of his plea bargain with the prosecution was that the state would not pursue charges against his mother for attempting to smuggle a knife to him in the Geauga County jail. This aspect of the plea agreement was never disclosed to the defense, nor was an incident report from jail authorities documenting the incident when they discovered the knife in Busta's personal effects.

The trial court dismissed this evidence on the basis of *res judicata,* stating that Busta's motivation to lie was adequately covered at trial. However, this evidence is *dehors* the trial record, and was not available for use in the direct appeal. Thus, it falls into an exception to the doctrine of *res judicata.* See *State v. Sopjack* (Aug. 22, 1997), Geauga App. No. 96–G–2004, unreported, at 7–8, 1997 WL 585904. It is relevant and material because it provides an extra reason for Busta to concoct a story about his alleged accomplices.

■ Any one of these pieces of evidence might not have been sufficient to warrant a hearing on the postconviction petition, if considered in isolation. However, when considered together, it is at least arguable that the evidence "puts the whole case in such a different light as to undermine confidence in the verdict." *Kyles,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490. As such, the petition and supporting materials raise a genuine issue whether the state violated

Resh's due process rights under *Brady*. The trial court abused its discretion in refusing to hold an evidentiary hearing. Although this evidence may not be sufficient to ultimately prove the allegations presented here, Resh must be afforded his day in court.

The first assignment of error has merit and is sustained.

Based upon our analysis of appellant's first argument under his first assignment of error, it is not necessary to address his second argument—that he was denied effective assistance of counsel—since he will receive an evidentiary hearing on his entire postconviction-relief petition, including his ineffective assistance of counsel claim.

The third assignment of error is also meritorious to the extent that the trial court erred in relying on *res judicata* as a basis for rejecting the petition. *Res judicata* does not apply because Resh could not have reasonably discovered the attached evidential materials at or before trial. See *State v. Smith* (Aug. 22, 1997), Portage App. No. 96–P–0275, unreported, at 8.

Our analysis of appellant's first and third assignments of error renders moot appellant's other assignments of error. Accordingly, they will not be addressed pursuant to App.R. 12(A)(1)(c).

The trial court's judgment is reversed, and the cause is remanded with instructions to conduct an evidentiary hearing.

*Judgment accordingly.*

FORD, P.J., and WILLIAM M. O'NEILL, J., concur.