[Cite as *State v. Pheils*, 2015-Ohio-3664.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio                                        Court of Appeals No. WD-14-072

     Appellee                                     Trial Court No. 2011CR0177

v.

Ronald Pheils                                        **DECISION AND JUDGMENT**

     Appellant                                    Decided:  September 9, 2015

* * * * *

Paul A. Dobson, Wood County Prosecuting Attorney, Gwen
Howe-Gebers and David E. Romaker, Jr., Assistant Prosecuting
Attorneys, for appellee.

Timothy Young, Ohio Public Defender, and Francisco E. Luttecke,
Assistant State Public Defender, for appellant.

* * * * *

**SINGER, J.**

{¶ 1} Appellant, Ronald Pheils, appeals the judgment of the Wood County Court

of Common Pleas which denied his petition for postconviction relief.  For the reasons

that follow, we reverse the judgment of the trial court.

**{¶ 2}** Appellant sets forth one assignment of error:

The trial court erred in dismissing Ronald Pheils's petition because it based its findings and conclusions on erroneous facts and examined the evidence presented with an unreasonable and unsound attitude. (September 8, 2014 Judgment Entry).

**{¶ 3}** This matter originates from appellant's January 25, 2012 conviction for reckless homicide. Appellant was sentenced to a 36-month term of imprisonment.

**{¶ 4}** By way of background, in late 2010 through early 2011, three-year-old Joshua Cox lived with his mother and two older brothers in Perrysburg Township, Wood County, Ohio. Beginning in December 2010, Joshua became progressively sick and visited the doctor a few times. On March 12, 2011, Joshua was taken to the doctor, as he was ill and lethargic. The pediatrician admitted Joshua to the hospital, where he remained for three days. After release, his symptoms continued and on March 21, 2011, Joshua was diagnosed with a sinus infection and prescribed an antibiotic.

**{¶ 5}** On March 23, 2011, appellant, Joshua's 19-year-old neighbor, was babysitting Joshua while Joshua's mother was at work. According to appellant, he heard a thump from the bedroom and went into the bedroom where he found Joshua on the floor, gasping for breath. Appellant reported that he moved the boy to a couch and called Joshua's mother. Joshua's mother returned home to find the boy unresponsive; she called 9-1-1. Paramedics arrived within minutes and concluded Joshua was in serious condition. Joshua was transported to a Toledo hospital where he died three days later.

2.

**{¶ 6}** An autopsy conducted by a Lucas County deputy coroner found Joshua had subgaleal and subarachnoid hemorrhaging, subdural bleeding, and axonal injuries. The coroner concluded these injuries were due to what was formerly called "shaken baby syndrome," now called "whiplash syndrome" or "abusive head trauma." The coroner ruled Joshua's death a homicide, resulting from child abuse.

**{¶ 7}** On April 6, 2011, a Wood County Grand Jury indicted appellant on one count of reckless homicide. Appellant pled not guilty.

**{¶ 8}** The matter proceeded to a jury trial. Numerous witnesses testified at trial, including Joshua's pediatrician, Dr. Olszewski, and Dr. Scala-Barnett, the deputy coroner. Dr. Scala-Barnett opined that Joshua's fatal injuries were due to abusive head trauma caused by violent shaking. An investigator from the coroner's office and a fellow inmate of appellant's both testified that appellant admitted to shaking the child. Appellant testified at trial and denied making these statements to the coroner's investigator and the inmate. Appellant testified he had never shaken Joshua. The defense called no medical experts.

**{¶ 9}** Appellant was convicted of reckless homicide and sentenced to prison. Appellant served this term of imprisonment and is no longer incarcerated. Appellant appealed his conviction, citing among other assignments of error, ineffective assistance of counsel for failing to timely locate an expert witness. This court previously affirmed the trial court's judgment and rejected the aforementioned ground for relief. *State v. Pheils*, 6th Dist. Wood No. WD-12-010, 2013-Ohio-2252.

3.

{¶ 10} Subsequently, appellant filed a petition for postconviction relief seeking to have the court vacate his conviction of reckless homicide or grant him a new trial. Again, appellant asserted ineffective assistance of counsel and supported his claim with his trial counsel's affidavit and a report authored by forensic pathologist Thomas W. Young, who reached a different conclusion than that of the deputy coroner. The trial court rejected appellant's postconviction petition without a hearing. Appellant appealed. We found appellant presented evidentiary materials which contained sufficient operative facts to establish a substantial violation of counsel's duties, which operated to appellant's prejudice. *State v. Pheils*, 6th Dist. Wood No. WD-12-010, 2014-Ohio-1454, ¶ 21. We further found the trial court erred in denying appellant an evidentiary hearing on the petition and remanded the case for hearing. *Id.*

{¶ 11} On August 20 and 21, 2014, the trial court conducted an evidentiary hearing at which Dr. Olszewski and Dr. Scala-Barnett testified for the state and Drs. Young and Hua testified on behalf of appellant. On September 8, 2014, the trial court again denied appellant postconviction relief. The court found appellant's two expert witnesses rendered conflicting opinions, both experts lacked credibility and believability and the experts' conclusions were not sustainable by the evidence. The court further found that any deficiency in trial counsel to secure the testimony of the experts did not work to appellant's prejudice because, had the jury heard the testimony of Drs. Young and Hua, the trial outcome would be no different. The court concluded appellant did not

4.

suffer from constitutionally ineffective assistance of counsel and was not entitled to the relief sought in his petition. It is from this judgment that appellant appeals.

{¶ 12} The appellate standard for review of a decision denying a petition for postconviction relief is abuse of discretion. *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, ¶ 58. "When a trial court rules on a petition for postconviction relief after a hearing, an appellate court will give deference to the trial court's findings of fact." *Id.* at ¶ 47. An abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). "Abuse of discretion" is a term of art, describing a judgment neither comporting with the record, nor reason. *See State v. Ferranto*, 112 Ohio St. 667, 676-678, 148 N.E. 362 (1925). "A decision is unreasonable if there is no sound reasoning process that would support that decision." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

{¶ 13} It is well-established that claims of ineffective assistance of counsel are reviewed under the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to establish ineffective assistance of counsel, an appellant must show: (1) that his trial counsel's performance was so deficient that the attorney was not functioning as the counsel guaranteed by the Sixth Amendment of the United States Constitution, and (2) that counsel's deficient performance prejudiced the defense. *Id.* at 687.

**Expert Witness Testimony**

**Dr. Colleen Olszewski**

{¶ 14} Dr. Olszewski testified at both the trial and the evidentiary hearing. She testified at the hearing that she was Joshua's primary care physician since he was discharged from the intensive care unit following his premature birth in 2008.

{¶ 15} On March 8, 2011, a doctor in Dr. Olszewski's practice saw Joshua at the office. Joshua was vomiting, had a fever and ear pain and tested positive for influenza strains A and B. On March 12, 2011, Joshua returned to the office because he continued to vomit. Dr. Olszewski saw Joshua that day and noted, "[h]e didn't walk into the office, he was carried in, he was carried upright and straight [like a board] and that is unusual for his age." In the examination room, "[h]e was laying on the table underneath dad's coat I think saying that he was cold, although he felt warm when I touched him. His eyes were closed and he was laying still when I first saw him." She observed that "Josh was not able to easily express what was wrong with him. * * * He opened his eyes to questions but didn't really say yes or no." Although Joshua was able to sit up when asked, it was difficult. It was also challenging for Joshua to bring his head and knees towards his chest. The doctor noticed Joshua's mouth was dry and he had a little bit of bruising on his face. She was concerned with his neurological exam, and that he might have meningitis, so Joshua was admitted to the hospital, where he was given IV fluids and testing was ordered. The next day, Dr. Olszewski saw Joshua in the hospital and he was moving better and the bruising had improved, but he still had some issues with his neck

6.

and "didn't feel great." Test results came back negative for meningitis and the CT scan was normal; tests for blood bleeding times were not completed. When Joshua was released from the hospital on March 15, 2011, he had been rehydrated.

{¶ 16} On March 18, 2011, Joshua returned to the office and saw another doctor in the practice. He again returned to the office on March 21, 2011, and was seen by Dr. Olszewski who noted Joshua "was interactive and talking. He walked himself in and sat down." Joshua had been vomiting, had a fever and sinus infection, so he was given antibiotics. The doctor further observed "for Joshua vomiting was almost a symptom of every time he was sick. He had a history of reflex or Gerd and easily was throwing up and had been treated for that prior to any of these illnesses."

**Dr. Zhonxue Hua**

{¶ 17} Dr. Hua testified at the hearing that he reviewed Joshua's pediatrician's medical records as well as the records from Joshua's hospital stays, the autopsy report and slides and some of the transcript from appellant's trial. Dr. Hua opined Joshua died from a neurological disease, CVT. Dr. Hua prepared a four page report outlining his review of the information and his findings. In simple terms, Dr. Hua explained CVT is a "blood clot formation when you are still alive inside your brain." A clot in the brain prevents blood flow and the brain cannot receive proper oxygen and glucose, causing tissue necrosis. Dr. Hua testified CVT is idiopathic, "we do not know * * * why certain people have this diagnosis," but about three-quarters are due to infection, roughly one quarter are linked with over-coagulation, which can form blood clots, another association

7.

is vascular disease, "you have dehydration, you can have this" and there is also a remote association with head trauma. Dr. Hua said "[s]uspicion of CVT can be raised on an MRI scan or contrast CT." Dr. Hua noted no coagulation panel was performed when Joshua was healthy. Dr. Hua testified at the time of the first hospitalization, Joshua presented with neurological symptoms, as he was more stiff than usual, had a viral infection, had "a red spot in the face and the arm," and had "vomiting and dehydration-related symptoms." Following Joshua's discharge from the three-day hospital stay, there was no definitive answer as to why he was suffering from some type of neurological process. Dr. Hua stated CVT is mentioned in the autopsy report, as it states in the small vessel deep in the brain there is evidence of blood clot formation. The doctor also noted radiology found the dural vessel, where the blood drains out of the head first, was clogged in multiple areas and the MRV (magnetic resonance venography, an MRI study of the blood vessels) report stated "suggesting extensive venous sinus thrombosis."

{¶ 18} Dr. Hua testified "I have no problem [with] people making [a] diagnosis [of shaken baby syndrome] as long as they do not make it automatically a diagnosis." The doctor stated you also have to look at CVT and over-coagulation. Dr. Hua testified the triad of symptoms which indicate shaken baby syndrome are: subdural hemorrhage, retinal hemorrhage and generalized brain dysfunction. With respect to retinal hemorrhage, the doctor stated, with shaken baby syndrome, there is extensive retinal hemorrhage, but with Joshua it was not extensive and it was predominantly in one eye. Regarding subdural hemorrhaging, the doctor testified this type of hemorrhaging comes

8.

from the bridging vessel which is "high blood flow at a high speed. If there is any damage, leakage of the bridging vein, you would expect a tremendous amount of blood." However, Joshua had a thin film of blood and "[y]ou cannot really attribute this to a bridging vein." Dr. Hua noted Joshua had generalized brain dysfunction, but "you cannot really assign this due to a trauma" since Joshua had been on life support for three days. Concerning the diffuse axonal injury to Joshua's brain, the doctor opined it could be caused by trauma or by non-traumatic reasons like over-coagulation and CVT.

{¶ 19} Dr. Hua testified the only external injury Joshua had was in his penis area; there were no "grab marks" on his body, which would be expected if shaken baby was the cause of the abusive head trauma.

### Dr. Diane Scala-Barnett

{¶ 20} Dr. Scala-Barnett testified at both the trial and the evidentiary hearing. At the hearing, she testified regarding the findings of Joshua's autopsy. "Externally there was really not a lot of injury noted * * * [h]e had a little dried abrasion on the left shoulder * * * and some genital injuries" which included "light bruising" and "an abrasion." Upon dissection, "[t]here was bruising not only where those [external] bruises occurred but high on the pubic bone." She learned from the records "that mom called * * * her pediatrician - to describe the injury to her, so it was present far before he ever got to the hospital." Dr. Scala-Barnett was also provided with information that Joshua had gotten the injury from a "baby toilet seat coming down on him," but this was not

9.

consistent "[b]ecause that injury would not have caused bleeding up on a pubic bone. * * * It may have caused a little bit of bruising but not in this distribution."

{¶ 21} The internal examination showed Joshua had two subgaleal hemorrhages on his head as well as "subdural hematoma and subarachnoid hemorrhage." The brain was extremely swollen and herniated into the spinal canal and there was some optic nerve sheath hemorrhages. She opined "you don't get this kind of injury from falling off a bed."

{¶ 22} Microscopically, there was no evidence of inflammation of residual infectious disease, but Dr. Scala-Barnett did observe axonal injury in numerous places in the brain. She stated "[t]here is no other explanation of getting axonal injury in all of those different places apart from severe trauma." She observed "hemorrhage into the fluid in the eye" and in the retina of the eyes, "multi-layered hemorrhages" in one eye and "[i]n the other eye there were hemorrhage in two layers." She testified "[t]he fact that they are there indicate again part of the triad of this injured child." According to the doctor, the triad with respect to shaken baby syndrome, "is three or four major findings that you put together as all things coming together to make a diagnosis. The triad is subarachnoid[,] subdural, retinal hemorrhages, severe cerebral edema. To support that triad you have axonal injury and retina hemorrhages." After Dr. Scala-Barnett conducted the autopsy, talked with the investigator and Joshua's pediatrician and reviewed the medical records from the two hospital admissions, she concluded "[t]hat this was abusive head trauma inflicted non-accidental injuries."

10.

**{¶ 23}** Dr. Scala-Barnett ruled out that Joshua had CVT, as opined by Dr. Hua, stating "he would have been sick as hell * * * [and] had the worst headache of his life. He would have been screaming * * * [and] holding his head." Microscopically, she found, "[y]ou don't have an organized clot there."

### Dr. Thomas Young

**{¶ 24}** Dr. Young testified at the hearing that he reviewed Joshua's medical records, including from both hospitalizations and the pediatric records, the autopsy report and slides and the transcript from appellant's trial. Dr. Young opined Joshua's cause of death was natural, due to complications of viral myocarditis. The doctor prepared a report and an addendum report with his opinion. A viral myocarditis means an inflammation of the heart muscle caused by viruses. Dr. Young testified Joshua had a flu-like illness and positive test results for influenza types A and B, "[s]o all the way up to the final hospitalization he had a viral illness." In the autopsy report, the doctor noted references to "myocardial necrosis" and "inflammatory cells with some eosinophilia" in the heart, which caught his attention "because that is essentially a description of a viral myocarditis." Dr. Young opined Joshua had a cardiac arrest at the house which caused lack of oxygen and blood flow to the brain, which then caused brain swelling and various forms of hemorrhages. The doctor testified he did not see any evidence that Joshua suffered traumatic injury, although the doctor would expect to see some manifestations of severe external trauma where traumatic injuries caused global brain damage.

11.

{¶ 25} Dr. Young testified he does not believe in shaken baby syndrome. He did agree with most of the coroner's findings, but did not agree with her conclusion. Dr. Young opined having axonal bulbs does not mean a shearing of the axons as "more people are realizing that you can make these kinds of findings in the setting of hypoxic ischemic encephalopathy as well."

**Trial Court's Judgment Entry**

{¶ 26} On September 8, 2014, the trial court denied appellant's petition for postconviction relief. The court noted Dr. Young agreed with all of the coroner's findings concerning Joshua's autopsy, but Dr. Young did not concur with the coroner's conclusion that Joshua died from abusive head trauma. Rather, Dr. Young opined Joshua died from myocarditis, an inflammation of the heart caused by a virus. The court observed that Dr. Young testified he does not believe in shaken baby syndrome. The court found Dr. Young's opinion was not believable.

{¶ 27} The trial court found Dr. Hua's conflicting opinion "to be equally unbelievable." The court commented that Dr. Hua opined that Joshua died from CVT, "which he various described as cortical vein thrombosis and cerebral venous thrombosis" and which is idiopathic, "but he acknowledged that head trauma can cause CVT." The court commented "not even Dr. Young believes that CVT was involved in the death of Joshua Cox."

{¶ 28} The trial court observed there were discussions regarding the triad of shaken baby symptoms which are "subdural hemorrhage, retinal hemorrhage, and

12.

generalized brain dysfunction." The court noted Dr. Hua testified "the presence of the triad alone should not automatically lead to a diagnosis of shaken baby syndrome." The court also noted Dr. Hua stated it was essentially impossible to shake a baby and only have bleeding in one eye, and not leave marks, and the only external injury Joshua had was in the penis area. The court found neither expert's opinion "fit well in the context of the trial testimony" as "they have no explanation as to how, in the absence of abuse, a child sustains the bruising that was documented during the autopsy."

**Analysis**

{¶ 29} This court previously found, based upon the evidentiary materials offered by appellant with his petition for postconviction relief, that appellant's counsel was deficient. Thus, the only issue before us now is whether the trial court abused its discretion in determining counsel's deficient performance did not prejudice appellant.

{¶ 30} Prejudice is shown where there is a reasonable probability that a different result would have occurred in the case but for the counsel's unprofessional errors. *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph three of the syllabus. The Supreme Court defines a reasonable probability as "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 31} In a hearing on a petition for postconviction relief, the trial court is the trier of fact. *State v. Salter*, 6th Dist. Lucas No. L-99-1050, 2000 WL 125809, *4 (Feb. 4, 2000). As such, the trial court determines the weight to be given to the evidence and

assesses the credibility of the witnesses. *Id.*, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. Nevertheless, the trial court's findings must be supported by competent, credible evidence in the record. *State v. Isham*, 2d Dist. Montgomery No. 15136, 1995 WL 502255, *2 (Aug. 23, 1995). An abuse of discretion may be found if the trial court relies on clearly erroneous findings of fact. *Thomas v. Cleveland*, 176 Ohio App.3d 401, 2008-Ohio-1720, 892 N.E.2d 454, ¶ 15 (8th Dist.).

{¶ 32} Here, after the testimony of the defense experts was presented at the evidentiary hearing, the trial court found the experts rendered conflicting opinions, lacked credibility and believability and their conclusions were not sustainable by the evidence. The court concluded had the jury during the trial heard the testimony of Drs. Young and Hua, there would not have been a different outcome, thus appellant was not prejudiced.

{¶ 33} Appellant asserts the trial court erred in dismissing his petition because it based its findings and conclusions on erroneous facts and examined the evidence presented with an unreasonable and unsound attitude. Appellant contends the court incorrectly stated Dr. Hua testified "the damage found on Joshua Cox * * * could have also been caused by CVT, CVT is an alternative explanation" and "axonal injury could have caused the trauma here," as Dr. Hua never based his opinion on an alternative explanation, and all of the experts agreed trauma can be the cause of axonal injury, not the other way around. Appellant also argues the trial court demonstrated an unreasonable attitude because the court seemed to take issue with where Drs. Young and Hua were

from, Dr. Hua's conservative approach to diagnosing shaken baby syndrome and Dr. Hua's use of different names to refer to CVT.

{¶ 34} Concerning the trial court's finding that the defense experts rendered conflicting opinions, a review of the evidence shows Dr. Young opined Joshua died from complications of viral myocarditis while Dr. Hua concluded Joshua died of CVT. Thus, both experts concluded Joshua died as a result of natural causes. Therefore, although the defense experts held differing opinions as to the exact cause of Joshua's death, they both agreed the manner of his death was by natural means. Consequently, the opinions are reconcilable with each other and therefore are not conflicting.

{¶ 35} With respect to Dr. Young, the court set forth in its judgment entry that the doctor testified "there is no such thing as shaken baby syndrome" and "that a child who had been shaken by an adult would look beaten up, but he sees no evidence of that here, although he admits that he was not present for the autopsy." The court commented "[t]he deputy coroner who conducted the autopsy noted abrasions and bruising on the body." The court also found Dr. Young offered no explanation as to how, in the absence of abuse, a child could sustain the bruising that was documented during the autopsy. The trial court then concluded Dr. Young's opinion was not believable and his conclusions were not supported by the evidence.

{¶ 36} The record shows Dr. Young testified "[i]n order for somebody to die as a result of trauma, which basically means that there is some external force * * * usually there is evidence of that kind of energy. * * * [T]he child looks beat up. The child looks

15.

traumatized. Scalp lacerations, skull fractures, broken bones, tears." In Dr. Young's review of the autopsy report, he found "there are some areas of hemorrhage. * * * But, in terms of scrapes, abrasions, lacerations, fractures, there were none of these." On the issue of external trauma suffered by Joshua, the coroner testified "[e]xternally there was really not a lot of injury noted * * * [h]e had a little dried abrasion on the left shoulder * * * and some genital injuries" including "light bruising" and "an abrasion."

{¶ 37} The record further shows that Dr. Young, in his August 31, 2012 report, stated,

> An evaluation of the investigative reports and the medical records indicates the child had problems with easy bruisability noted by medical personnel in previous hospital admissions and by a babysitter. The mother also stated that she had similar bruising problems. At no time was the child or the mother ever evaluated for a coagulopathy. If the child had an unidentified disorder of his coagulation system, minor bumps of the head could lead to the deep scalp hemorrhages in the front and back of the head.

{¶ 38} Dr. Young also testified areas of hemorrhage beneath the skin can be caused by minor handling since there was a "disruption in the child's coagulation system." Dr. Young opined the child "is going to bleed very, very easily. * * * These areas of bleeding can arise spontaneously or they can arise from even minor trauma."

{¶ 39} Our review of the record reveals the trial court's finding that Dr. Young's opinion was not sustainable by the evidence and was not believable is belied by the

16.

evidence in the record.  Dr. Young's testimony that he saw no evidence of trauma to Joshua is supported by the coroner's finding that there was not a lot of external injury. Moreover, Dr. Young clearly addressed the subject of bruising in both his testimony and his report.  We are therefore compelled to conclude the trial court's rulings that Dr. Young was not believable and his opinion was not sustainable by the evidence are not supported by competent, credible evidence.

{¶ 40} Regarding Dr. Hua, the court set forth in its judgment entry that "Dr. Hua testified (paraphrasing) 'there is no mistake about it, a traumatic injury could have caused the damage found in Joshua Cox, but the diagnosis of abuse should not be automatic; an axonal injury could have caused the trauma here but the damage could also have been caused by CVT, CVT is an alternative explanation.'"  This is a misstatement of Dr. Hua's testimony regarding axonal injury and CVT being an alternative explanation.

{¶ 41} A review of the record shows Dr. Hua testified with shaken baby syndrome, there is extensive retinal hemorrhage, but with Joshua "it's not extensive.  But, more critical here is just imagine if you're shaking a baby, you would expect both eyes are hemorrhaged.  But, in this case it was a different picture.  This case was predominantly the left eye hemorrhage."  Dr. Hua's conclusions were supported by the evidence as they are consistent with the coroner's testimony regarding the autopsy findings.  Dr. Hua also perceived the only external injury Joshua had was in the penis area.  Again, this observation was consistent with the coroner's testimony and autopsy findings.  Moreover, although the court stated Dr. Hua offered no explanation as to how,

in the absence of abuse, a child could sustain the bruising that was documented during the autopsy, Dr. Hua testified that "[a]n alternative explanation that is non-controversial and widely accepted as non-traumatic causes include coagulopathy - means over-coagulation * * * and selected among of rare diseases, cerebral venous thrombosis in one of the diseases* * *." Based upon the foregoing, Dr. Hua's opinion is sustainable by the evidence; the court's credibility assessment of Dr. Hua is not. The trial court's determinations that Dr. Hua was not believable and his opinion was not sustainable by the evidence are not supported by competent, credible evidence in the record.

{¶ 42} As the evidence in the record does not support the trial court's rulings regarding Drs. Young and Hua, we conclude the trial court abused its discretion in finding appellant was not prejudiced by his trial counsel's failure to secure expert testimony at trial. We further conclude there is a reasonable probability that a jury faced with competing medical opinions as to the manner of Joshua's death, by natural causes or homicide, would reach a different result at a new trial. Accordingly, appellant's sole assignment of error is well-taken.

{¶ 43} On consideration whereof, the judgment of the Wood County Court of Common Pleas is reversed and remanded to said court for further proceedings consistent with this decision. Costs of this appeal are assessed to appellee pursuant to App.R. 24.

Judgment reversed.

18.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J.       _____

              JUDGE

Stephen A. Yarbrough, P.J.

             _____

James D. Jensen, J.        JUDGE
CONCUR.

             _____

              JUDGE

---

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at:
http://www.sconet.state.oh.us/rod/newpdf/?source=6.